|  |  |
|---|---|
| L.W., a minor, by her parent and next friend BRIDGETT J., and BRIDGETT J., | |
| Plaintiffs, | No. 13 CV 8463 |
| v. | Judge Manish S. Shah |
| ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

In July 2012, investigators from the Illinois Department of Children and Family Services (DCFS) removed L.W., then a toddler, from her mother Bridgett's custody. Bridgett was not allowed to have any contact with her daughter for the next two weeks. DCFS then permitted Bridgett to see L.W. on a supervised basis for approximately eight months, after which Bridgett regained full custody. In the meantime, DCFS investigators also decided that Bridgett should be recorded in their central register as a perpetrator of child neglect. A DCFS administrator agreed with this recommendation, and Bridgett's name appeared in the register for approximately six months before the finding was reversed and expunged. Bridgett was unable to work as a substitute teacher during that time.

Bridgett and L.W. filed suit against DCFS, its director, the investigators who removed (or approved the removal of) L.W. from Bridgett's care, and the DCFS administrator who concurred in the recommendation to register Bridgett as a

perpetrator of child neglect. The complaint includes: L.W.'s claim of unreasonable seizure under the Fourth Amendment (Count I), L.W. and Bridgett's substantive due-process claim (Count II), L.W. and Bridgett's procedural due-process claim (Count III), and Bridgett's own procedural due-process claim (Count IV)—each brought pursuant to 42 U.S.C. § 1983; as well as Bridgett's claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Counts V and VI, respectively). The defendants now move to dismiss all six claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I grant in part and deny in part defendants' motion.

## I.    Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To satisfy these "notice" pleading requirements, the complaint need not set forth detailed factual allegations. *Id.* (citation omitted). But it must present enough "factual matter, accepted as true, [that the] 'claim to relief . . . is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Motions under Rule 12(b)(6) are meant "to test the sufficiency of the complaint, not . . . the merits" of the plaintiff's case. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir. 1996) (quoting *Triad Assocs., Inc. v. Chicago Hous.*

*Auth.*, 892 F.3d 583, 586 (7th Cir. 1989)). In considering a Rule 12(b)(6) motion to dismiss, I therefore accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013) (quoting *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)).

## II.    Facts

### A.    The Illinois Abused and Neglected Child Reporting Act

The Illinois Abused and Neglected Child Reporting Act, or ANCRA, 325 ILCS 5/1 *et seq.*, authorizes or (in some cases) requires DCFS to take certain actions to protect Illinois children from abuse or neglect, *see, e.g.*, *id.* at 5/2(a). Under ANCRA, DCFS is obligated to receive and investigate reports of suspected child abuse or neglect. *See id.* at 5/2(b), 5/7.3(a). Initial reports of suspected abuse or neglect may take the form of "hotline" calls made to the agency. *See id.* 5/7.6; *see also* [1] ¶ 22.[1]

In investigating any initial reports, DCFS must determine if there is indeed credible evidence of abuse or neglect. If so, the agency labels the report as "indicated." *See* 325 ILCS 5/3, 5/7.12; [1] ¶ 29. If there is no such credible evidence, the report is deemed "unfounded." *See* 325 ILCS 5/8.1, 5/7.12; [1] ¶ 29. Final determinations of "indicated" or "unfounded" are recorded in a central register maintained by the agency. 325 ILCS 5/7.12; [1] ¶ 30. Indicated reports remain in the register for several years, and include identifying information about the perpetrator. *See* 325 ILCS 5/7.14; [1] ¶ 33.

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets.

Additional procedures are provided if the individual accused of child abuse or neglect also works with children. Once the DCFS investigator, her supervisor, and a Child Protection Manager have all agreed that such a report should be indicated, the alleged perpetrator is entitled to an "administrator's teleconference." *See* 89 Ill. Admin. Code § 300.160(c)(1)(A); [1] ¶ 31. During the teleconference, the alleged perpetrator may present to the presiding DCFS administrator any documents or other information that she believes will help tell her own side of the story. *See id.* The administrator is also provided with a copy of all evidence gathered by the investigator concerning the purported abuse or neglect. *See id.* § 300.160(c)(3)(C).

The administrator then makes a decision to uphold or decline the investigator's recommendation to "indicate," and notifies the alleged perpetrator of that decision. *See id.* § 300.160(c)(4)(D). Once an individual has been formally indicated, he or she may appeal that decision in a hearing before an administrative law judge. *See* 325 ILCS 5/7.16; [1] ¶ 34. The judge may remove or amend an indicated report (to be "unfounded"), in which case the accused's identifying information is expunged. *See* 325 ILCS 5/7.14, 5/7.16.

If, in the course of its investigation, DCFS also determines that the child's health or safety would be endangered if left in the parent's care, DCFS may temporarily remove the child from that parent's custody. *See* 325 ILCS 5/5; [1] ¶ 23. DCFS may effect such a removal without first obtaining a court order, but may do so only if there is not time enough in which to apply for such an order. *See id.*

## B.    "Allegation 60"

In order for DCFS to accept from a third party a report of suspected child abuse or neglect, agency regulations provide that the report must include allegations of "specific incidents of harm" to the child. 89 Ill. Admin. Code § 300 App. B; *see also* [1] ¶ 35. The regulations include a series of numbered "allegations" that meet this requirement. *See id.* "Allegation 60" is an allegation that the child's environment is injurious to her health and welfare. *See id.*

On December 11, 2011, the Illinois Court of Appeals determined that Allegation 60 exceeded the scope of authority granted to DCFS under ANCRA, and held that this specific allegation was therefore void *ab initio*. *See Julie Q. v. Dep't of Children and Family Servs.*, 963 N.E.2d 401, 413 (Ill. App. Ct. 2011); *see also* [1] ¶¶ 36, 67. In March 2013, the Supreme Court of Illinois affirmed the appellate court's decision. *See Julie Q. v. Dep't of Children and Family Servs.*, 995 N.E.2d 977, 986 (Ill. 2013); *see also* [1] ¶¶ 36, 67.

## C.    The Removal of L.W. from Bridgett's Custody

Bridgett J., a substitute teacher and licensed social worker, is the mother of L.W. [1] ¶¶ 39, 69. On July 17, 2012 (when L.W. was a toddler), DCFS received a hotline call about L.W. and Bridgett, *see id.* ¶¶ 1, 40. According to the caller, Bridgett suffered from paranoid schizophrenia but was not taking her prescribed medication or receiving counseling for that illness, putting L.W. at risk of harm. *See id.* ¶ 40. DCFS assigned Brenda Simpson to investigate this report. *See id.* ¶¶ 2, 17.

On July 30, 2012, Simpson visited Bridgett and L.W.'s home, which they shared with Bridgett's parents. *See id.* ¶ 41. During her visit, Simpson spoke with Bridgett and her family. *See id.* ¶¶ 41–43. Bridgett told Simpson that she had never been diagnosed with paranoid schizophrenia, *id.* ¶ 42, though she did have a history of depression for which she had received medication and counseling in the past, *id.* ¶ 40. Bridgett's family told Simpson that Bridgett had been exhibiting "bizarre" behavior, *see id.* ¶ 43, though L.W. did not show any visible signs of abuse or neglect, *see id.* ¶ 41. Based on her observations, Simpson ordered Bridgett to seek an inpatient psychiatric evaluation and informed Bridgett that she would have to relinquish custody of L.W. *See id.* ¶ 43. Simpson then placed L.W. under the temporary care of Bridgett's sister. *See id.* ¶ 45.

The next day, Bridgett sought and obtained a psychiatric evaluation at a nearby hospital. *See id.* ¶ 44. She was told by hospital staff that she did not need inpatient care. *See id.* When Bridgett went home from the hospital, her sister prevented her from leaving the house with L.W. (in accordance with Simpson's orders). *See id.* ¶ 45. Simpson then returned to the house Bridgett shared with her family and instructed Bridgett to pack up clothes and supplies for L.W., as Simpson intended to place L.W. in temporary protective custody with DCFS. *See id.* ¶ 46. Simpson again directed Bridgett to seek inpatient psychiatric treatment. *See id.* Simpson at first took L.W. to the local DCFS office, but soon placed L.W. again in the temporary care of Bridgett's sister (subject to supervision by DCFS). *See id.* ¶ 47. Bridgett was not to have any contact with L.W. *See id.* ¶ 55.

Also on July 31, 2012, Bridgett returned to the hospital—per Simpson's instructions—again seeking an inpatient psychiatric evaluation. *See id.* ¶ 51. Bridgett was told for a second time that she did not require inpatient care, and that she should not return to the hospital for emergency psychiatric treatment. *See id.* Bridgett immediately contacted Simpson to tell her that the hospital would not admit Bridgett. *See id.* In response, Simpson instructed Bridgett to make an appointment with her own psychiatrist, and told Bridgett that if the psychiatrist approved of her regaining custody, she would be able to do so within 72 hours. *See id.* ¶ 52.

On August 3, 2012, Bridgett visited her psychiatrist, who gave Bridgett his notes to pass along to Simpson. *See id.* ¶ 53. Simpson received the notes, but told Bridgett that they were insufficient to allow Bridgett to regain custody of her daughter. *See id.* Simpson again directed Bridgett to obtain inpatient psychiatric treatment. *See id.* Over the course of the next week, Bridgett sought such treatment from two additional hospitals, but neither would admit her. *See id.* ¶ 54. Simpson's orders prevented Bridgett from having any contact with L.W. during this time. *See id.* ¶ 55.

On August 14, 2012, Bridgett went to the DCFS office to ask about regaining custody of L.W. *See id.* ¶ 56. Bridgett there met with Murielle Pierre-Louis, Simpson's DCFS supervisor (who, according to Bridgett, had approved Simpson's removal of L.W.). *See id.* ¶¶ 18, 47, 56. Pierre-Louis told Bridgett that it would be all right for her to now have contact with L.W., but only if the contact was

supervised by Bridgett's sister. *See id.* ¶ 56. Several weeks later, on September 7, Pierre-Louis—along with Simpson and another of Simpson's supervisors, Tanya Carriere (who likewise had approved L.W.'s removal)—met again with Bridgett and her family. *See id.* ¶¶ 19, 47, 57. The DCFS investigators informed Bridgett that, although she was still permitted to see L.W., her contact must at all times going forward be supervised by Bridgett's parents. *See id.* ¶ 57. As a condition for this supervised contact, Simpson required that Bridgett seek outpatient counseling. *See id.* ¶ 61. Simpson also reiterated that, if Bridgett wished to regain full custody of her daughter—that is, to have *un*supervised contact—she first had to obtain an inpatient psychiatric evaluation. *See id.* ¶ 59.

Beginning in November 2012, Bridgett began counseling sessions at One Hope United, a non-profit organization selected by Simpson, Pierre-Louis, and Carriere as the facility from which Bridgett should seek outpatient care. *See id.* ¶¶ 61–62. According to Bridgett, One Hope provided regular reports to DCFS concerning Bridgett's treatment there. *See id.* ¶ 63. Bridgett ultimately regained full custody of L.W. in April 2013. *See id.* ¶ 64.

### D.     Bridgett's "Indicated" Report

Simpson and her supervisors (Pierre-Louis and Carriere) agreed that Bridgett should be "indicated" in the central register as a perpetrator of child neglect pursuant to Allegation 60 of the DCFS regulatory code. *See id.* ¶ 68. In October 2012, Simpson contacted Bridgett to inform her of this recommendation. *See id.* ¶ 65. Because Bridgett was a substitute teacher who worked with children,

she was entitled to participate in an administrator's teleconference before an indicated finding could be entered against her. *See id.* ¶ 69. Bridgett participated in such a conference on October 30, 2012, which was held by DCFS administrator Maria Miller. *See id.* ¶¶ 70–71. Miller ultimately concurred with the recommendation of Simpson and her supervisors, however, and affirmed the decision to indicate Bridgett as a perpetrator of child neglect. *See id.* ¶ 74. Bridgett was notified of this decision in December 2012. *See id.* ¶ 73.

As a result of the "indicated" finding, Bridgett was forced to take a leave of absence from her work as a substitute teacher. *See id.* ¶ 76. Nor could she seek future employment as a substitute teacher or social worker while the finding remained on record. *See id.* This was the case until June 26, 2013, when an administrative law judge, hearing Bridgett's case on appeal, reversed the finding and expunged it from the register. *See id.* ¶ 78.

### E.      Defendants' Motion to Dismiss

L.W. and Bridgett filed in federal court a series of claims under 42 U.S.C. § 1983, naming DCFS, Simpson and her supervisors (Pierre-Louis and Carriere), DCFS administrator Maria Miller, and then-acting director of DCFS, Denise Gonzales, as defendants. *See* [1] ¶¶ 82–112 (Counts I–IV). In addition, Bridgett alleged that DCFS and its employees had discriminated against her based on her history of depression and on the perception that she suffered from schizophrenia. She brought two corresponding intentional-discrimination claims, one under Title II of the Americans with Disabilities Act and the other under Section 504 of the

Rehabilitation Act. *See id.* ¶¶ 113–30 (Counts V–VI). Defendants jointly filed a motion to dismiss all six counts. [20, 22].

## III. Analysis

### A. L.W.'s Unreasonable Seizure Claim (Count I)

L.W. alleges that defendants Simpson, Pierre-Louis, and Carriere—each in her individual capacity—violated L.W.'s Fourth Amendment rights against unreasonable seizure by removing L.W. (or, in the case of Pierre-Louis and Carriere, approving the removal of L.W.) from her mother's custody without sufficient evidence of abuse or neglect. *See* [1] ¶¶ 84–85. The removal of a child from her family is a seizure under the Fourth Amendment. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011). L.W.'s allegations here, however, suggest that at least two separate seizures occurred in this case: (1) an "initial removal," which occurred when defendants first took L.W. away from her mother in July 2012; and (2) a "continued withholding," which spanned the ensuing two-week period when Bridgett was not allowed to have any contact with her daughter. *See id.* at 474–81 (analyzing both types of state interference as seizures under the Fourth Amendment).

#### 1. L.W.'s Initial Removal

The initial removal of a child from her parent's custody is reasonable under the Fourth Amendment, and thus constitutionally permissible, only if the removal is: (1) pursuant to a court order; (2) supported by probable cause (*i.e.*, a prudent caseworker could believe that the child is facing "an immediate threat of abuse"); or

(3) justified by exigent circumstances (*i.e.*, there is reason to believe that the child's "life or limb is in immediate jeopardy"). *Id.* at 474–75 (citations omitted). Since L.W. alleges here that she was initially removed from her mother's custody without a court order, *see* [1] ¶ 1, the removal was constitutionally sound only if it was supported by probable cause or exigent circumstances.

According to L.W., neither was present here. In support of this contention, she alleges that when Simpson decided to remove her on July 31, 2012, Simpson had only the following information: a tip from a hotline caller that Bridgett was suffering from paranoid schizophrenia; Bridgett's claim that she had never been diagnosed with that condition (but that she had been treated for depression in the past); comments by Bridgett's family that she had been behaving "bizarrely"; and the lack of any physical signs on L.W. of abuse or neglect. *See id.* ¶¶ 40–43, 48.

These allegations state a claim that L.W.'s initial removal was not supported by probable cause or justified by exigent circumstances. The allegations do not specify what exactly Bridgett's family told Simpson about Bridgett's supposedly "bizarre" behavior, and it is possible that the family's remarks would have suggested to a reasonable investigator that L.W.'s safety was at risk. At this stage, however, I assume the family's report of bizarre behavior was bereft of any detail about its effect on L.W., since I draw all reasonable inferences in plaintiffs' favor, *see Beyrer*, 722 F.3d at 946. Because the allegations do not "establish the reasonableness of [L.W.]'s seizure as a matter of law," L.W. has stated a proper

Fourth Amendment claim based on her initial removal. *Brokaw v. Mercer County*, 235 F.3d 1000, 1011 (7th Cir. 2000).

### 2. *The Continued Withholding of L.W.*

If, after an initial removal, a child is kept in protective custody for a period of time, this "continued withholding" is also considered a seizure under the Fourth Amendment. *See Hernandez*, 657 F.3d at 479–80. Thus, even if L.W.'s initial removal were reasonable, if the restrictions on her rights became unreasonable then she has stated a Fourth Amendment violation. *See id.* at 480–81 (discussing when probable cause likely "dissipated"). L.W. alleges here that she was initially taken away from her mother on July 31, 2012, *see* [1] ¶ 48, and that Bridgett was not allowed to see her daughter at all for the next two weeks (*i.e.*, until August 14 of that year), *see id.* ¶ 55. According to L.W., Bridgett told DCFS investigators during that two-week period that she had sought inpatient psychiatric treatment from several hospitals, but that none would admit her. *See id.* ¶¶ 51, 54.[2] L.W. also alleges that during her two-week withholding DCFS requested and received notes from Bridgett's own psychiatrist about her previous treatment. *See id.* ¶ 53.

These allegations plausibly suggest that the continued withholding became unconstitutional because there was no basis to keep L.W. separated from her

---

[2] Plaintiffs allege that Bridgett told Simpson on July 31, 2012, that one area hospital had refused to admit her for inpatient treatment. *See* [1] ¶ 51. Although plaintiffs do not state specifically that Bridgett also told Simpson (or any other DCFS employee) about similar responses from other area hospitals, I may reasonably infer from plaintiffs' allegations that Bridgett did inform Simpson of this fact. *See e.g.*, *id.* ¶ 59 (alleging that "[d]espite the prior repeated psychiatric clearances, . . . Simpson again demanded [in September 2012] that Bridgett J. receive an inpatient psychiatric evaluation").

mother. As with L.W.'s initial-removal claim, critical details are missing here—including and especially the contents of the notes from Bridgett's psychiatrist. Drawing all inferences in plaintiff's favor, I assume that the contents of those notes would not have suggested to a reasonable investigator that L.W.'s safety continued to be at risk. L.W. has stated a proper Fourth Amendment claim based on the continued withholding.

### 3. *Qualified Immunity*

Defendants argue that, regardless of whether L.W. has stated a proper Fourth Amendment claim, Simpson and her supervisors are entitled to qualified immunity on that claim. *See* [22] at 9–10. Qualified immunity, when available, shields certain government actors from a suit for damages if a reasonable official could have believed that the defendant's actions were permissible in light of clearly established law. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). The defense of qualified immunity gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 713 (citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011)).

Plaintiffs contend that, in this instance, qualified immunity is unavailable because Simpson, Pierre-Louis, and Carriere have been sued in their individual capacities. *See* [27] at 12. Plaintiffs are mistaken. These defendants may be entitled to qualified immunity precisely *because* they have been sued in their individual—and not official—capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985);

*see also Lane v. Franks*, 134 S.Ct. 2369, 2381 (2014). To overcome defendants' qualified-immunity defense, L.W. must show: (1) that the facts make out a violation of the Fourth Amendment; and (2) that the right alleged to have been violated was "clearly established" at the time of defendants' conduct. *See Abbott*, 705 F.3d at 713 (citations omitted).

Defendants urge that L.W. has not met this burden. *See* [31] at 3. However, dismissal of a Section 1983 claim based on a qualified-immunity defense "is a delicate matter that district courts should approach carefully." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n. 3 (7th Cir. 2000). While true that issues of qualified immunity "must be resolved at the earliest possible stage" of the case, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) (citation omitted), it is rarely appropriate to do so at the motion-to-dismiss stage, *see id.*, since qualified immunity usually depends on the particular facts of a case, and notice-pleading requirements do not mandate that plaintiffs plead facts that "anticipate and overcome" such a defense, *Jacobs*, 215 F.3d at 765 n. 3. Rule 12(b)(6), in other words, "is a mismatch for immunity and almost always a bad ground for dismissal." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (quoting *Jacobs*, 215 F.3d at 775 (Easterbrook, J., concurring)); *see also id.* at 651 ("Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate . . . .") (citation omitted).

Such is the case here. As discussed above, facts critical to determining whether defendants' actions were in fact reasonable under the Fourth Amendment

are absent from the complaint. This absence also bears on the determination of qualified immunity, since the missing facts, once brought to light, may indicate that defendants' conduct in removing (or withholding) L.W. was "obviously wrong"—and that, consequently, defendants "should have known they were violating [L.W.'s] constitutional rights." *Brokaw*, 235 F.3d at 1023.

As L.W. has stated allegations sufficient to plausibly suggest that her Fourth Amendment rights were violated, and because it is not yet appropriate to resolve the question of qualified immunity on this claim, defendants' motion to dismiss Count I of the complaint is denied.

### B.    L.W. and Bridgett's Substantive Due Process Claim (Count II)

Both L.W. and Bridgett contend that defendants' interference with Bridgett's custody of her daughter also gives rise to a claim under substantive due process. Plaintiffs bring this due-process claim against the same three defendants named in Count I (Simpson, Pierre-Louis, and Carriere), each sued again in her individual capacity. *See* [1] ¶¶ 90–94.

A family's right to remain together without interference by the state is an aspect of substantive due process. *See Hernandez*, 657 F.3d at 478 (citing *Doe v. Heck*, 327 F.3d 492, 524 (7th Cir. 2003); *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011)). This right is not unqualified, however. The state also has a valid interest in protecting children from abuse or neglect, and thus may interfere with a family's right to autonomy in certain instances. *See id.*; *see also Brokaw*, 235 F.3d at 1019. These instances arise where the state (or agency official

working on its behalf) has a "reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019 (citing *Croft v. Westmoreland Cnty. Children and Youth Serv.*, 103 F.3d 1123, 1126 (3d Cir. 1997)). A "reasonable suspicion" requires more than a hunch but less than probable cause. *Hernandez*, 657 F.3d at 478 (quoting *Siliven*, 635 F.3d at 928).

### 1. Bridgett's Substantive Due Process Claim

Bridgett incorporates into her substantive due-process claim the factual allegations supporting L.W.'s unreasonable-seizure claim. *See* [1] ¶ 90. These allegations state a claim that defendants lacked sufficient evidence, either before L.W.'s initial removal or during her continued withholding, that L.W. was in imminent danger. The allegations do not articulate what exactly Bridgett's family told Brenda Simpson in July 2012 or, subsequently, what Simpson and her supervisors learned from Bridgett's psychiatrist's notes. Although some of these factual gaps may ultimately be filled in defendants' favor, at this stage I draw all reasonable inferences in Bridgett's favor and assume that neither the remarks by her family nor the contents of her psychiatrist's notes would have given rise to a reasonable suspicion that L.W.'s safety was at risk. Thus, Bridgett has adequately stated a substantive due-process claim based on L.W.'s initial removal and continued withholding.

But Bridgett's due-process claim plausibly includes a third time period, as well: the "supervised contact" period. Bridgett alleges generally that defendants violated her due-process interests by restricting her "parental rights," *id.* ¶ 93,

which I may reasonably understand to include the specific custodial restrictions that defendants imposed on Bridgett beginning on August 14, 2012. Starting on that date (which also marks the end of the continued-withholding period), Bridgett was again allowed to see her daughter, but only if that contact was supervised. *See id.* ¶¶ 56–57. This restriction remained in place until April 2013, when Bridgett ultimately regained full custody of her daughter. *See id.* ¶ 64.

During the supervised-contact period, Bridgett alleges that DCFS continued its investigation of her case and, as part of that investigation, requested and received reports from One Hope United (the organization designated by DCFS to provide outpatient counseling services to Bridgett). *See id.* ¶¶ 61–63. Bridgett's allegations are enough to state a substantive due-process claim based on the restrictions imposed during the supervised-contact period. As with the portion of Bridgett's claim concerning L.W.'s initial removal and continued withholding, details are missing regarding the exact information that DCFS received about Bridgett's mental health and, accordingly, the impact her mental health might have had on L.W. At this juncture, I assume that what DCFS learned would not have given rise to a reasonable suspicion that L.W.'s safety was at risk. I therefore find that Bridgett has stated a proper due-process claim based on the supervised-contact period.

### 2. *L.W.'s Substantive Due Process Claim*

L.W. joins in her mother's substantive due-process claim. *See* [1] ¶ 89. The extent to which she may do so, however, depends on the extent to which L.W.'s

claim is more properly analyzed under the Fourth Amendment. *See Brokaw*, 235 F.3d at 1017 (explaining that where a plaintiff's substantive due-process claim "is premised on his seizure from his home, . . . it cannot succeed because . . . a specific constitutional provision [already] protects the right allegedly infringed" (citing *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997))); *see also Hernandez*, 657 F.3d at 479.

L.W.'s initial removal is specifically addressed by the Fourth Amendment. Likewise, her continued withholding is more properly governed by the Fourth Amendment, since the harm complained of during this period (*i.e.*, no contact with her mother, *see* [1] ¶ 55) is, other than the passage of time, no different than the harm allegedly caused by the initial removal. *See Hernandez*, 657 F.3d at 479–80. The substantive due-process claim is therefore dismissed—in part. To the extent L.W. bases her substantive due-process claim on the eight-month supervised-contact period that followed the continued withholding (*i.e.*, the period beginning on August 14, 2012 and ending in April 2013), that claim may proceed. *See id.* at 481–84 (also analyzing under due process a child's supervised-contact claim).[3]

### 3.    *Qualified Immunity*

Defendants argue that they are qualifiedly immune from Count II of the complaint. *See* [22] at 11. As Simpson and her supervisors are sued in their individual capacities, qualified immunity may be available. *See Graham*, 473 U.S.

---

[3] I note that only L.W.'s substantive due-process claims are limited to certain timeframes, as only L.W. was actually seized by defendants. Her mother, however, was not seized, and so may bring a substantive due-process claim based on all three time periods discussed above. *See Hernandez*, 657 F.3d at 474.

at 166–67. But here again, determination of qualified immunity requires additional factual development that cannot be completed at the motion-to-dismiss stage.

Defendants' motion to dismiss Count II of the complaint is therefore granted in part and denied in part. The motion is granted as it pertains to L.W.'s claim for a substantive due-process violation, insofar as that claim concerns her initial removal and continued withholding (*i.e.*, before supervised contact was permitted). The motion is denied with respect to the remainder of Count II.

### C.  L.W. and Bridgett's Procedural Due Process Claim (Count III)

L.W. and Bridgett also bring a procedural due-process claim against Simpson, Pierre-Louis, and Carriere. *See* [1] ¶ 99. Plaintiffs allege that these defendants seized L.W. and interfered with plaintiffs' familial autonomy without providing adequate means to challenge those intrusions on plaintiffs' rights. *See id.* ¶¶ 100–01.

Before the state may lawfully interfere with an individual's protected interests—or, alternatively, continue to interfere with such interests—the Constitution requires that the government provide that individual with a "meaningful" opportunity to challenge the impending (or ongoing) deprivation. *See Hernandez*, 657 F.3d at 484 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976))) (internal quotation marks omitted). What is "meaningful" depends on the particular circumstances of a case. *See id.* (citation omitted). In cases involving the removal of a child from her parent's

custody, what is "meaningful" also depends on when, in relation to the removal, the opportunity to challenge that interference was (or was not) provided. Here, plaintiffs allege that DCFS failed to provide a meaningful opportunity to challenge L.W.'s removal both before *and* after it occurred. *See* [1] ¶¶ 100–01. Count III of the complaint therefore contains two distinct claims, which I address separately.[4]

### 1. Pre-Removal Procedures

On behalf of the state, a DCFS official may lawfully remove a child from her home—without first obtaining a court order or providing a pre-deprivation hearing—if "the official has probable cause to believe that the child is in imminent danger of abuse." *Hernandez*, 657 at 486. According to plaintiffs, neither Simpson nor her supervisors obtained a court order before removing L.W., and nor did they provide a pre-removal hearing. *See* [1] ¶¶ 1, 50, 85, 92, 100.[5] The question is therefore whether defendants had probable cause to remove L.W. from Bridgett's care. As explained above, the complaint adequately alleges that defendants did not have probable cause; therefore, plaintiffs have adequately stated a procedural due-process claim insofar as that claim concerns the constitutionality of procedures (not) afforded before L.W.'s removal. Similarly, and for the same reasons discussed

---

[4] Defendants do not argue that any distinctions should be made among Simpson, Pierre-Louis, and Carriere concerning their personal involvement in providing (or not providing) certain pre- and post-removal procedures to Bridgett and L.W. I therefore refer to these defendants collectively in discussing Count III of the complaint.

[5] Although plaintiffs do not state explicitly that a pre-deprivation hearing was not afforded, I may reasonably draw this inference from the allegations in the complaint. *See, e.g.*, [1] ¶ 101 (alleging that defendants "fail[ed] to afford *any* procedure by which the restrictions [on Bridgett's parental rights] could be challenged") (emphasis added).

previously, there is insufficient information from which I may determine whether defendants are entitled to qualified immunity on this claim. Defendants' motion to dismiss Count III, insofar as that claim pertains to pre-removal procedures, is therefore denied.

### 2. Post-Removal Procedures

Even if defendants had probable cause to remove L.W. in July 2012, due process still mandated that plaintiffs be afforded a "prompt and fair" post-deprivation judicial review. *Brokaw*, 235 F.3d at 1021 (citations omitted); *see also Berman v. Young*, 291 F.3d 976, 985 (7th Cir. 2002). Plaintiffs allege that defendants never provided such a review even though they continued to interfere with Bridgett's custody for approximately eight months. *See* [1] ¶¶ 2–3, 55–64, 101. I therefore find that plaintiffs have adequately stated a procedural due-process claim as far as that claim concerns the constitutionality of procedures (not) afforded after L.W. was removed from Bridgett's care.[6]

Defendants assert a qualified-immunity defense to this claim, too, arguing that plaintiffs' post-removal rights were not "so well-developed as to place [Defendants] on notice that their actions were unlawful." [22] at 11 (quoting

---

[6] I note that, ultimately, plaintiffs may not prevail on this claim if they are unable to show, "with some degree of probability, that a timely hearing would have prevented the extended infringement on their familial rights." *Berman*, 291 F.3d at 985 (quoting *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) (internal quotation marks omitted). Plaintiffs, in other words, must show actual damages stemming from the absence of a post-deprivation hearing. *See id.* (citations omitted). For the purposes of deciding defendants' motion to dismiss, however, I find that the allegations in the complaint put defendants on sufficient notice of plaintiffs' claim, which satisfies the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.

*Brokaw*, 235 F.3d at 1023). Not so. At least ten years before defendants allegedly interfered with plaintiffs' parent-child relationship, the Seventh Circuit cautioned that due process obligated DCFS to provide a "prompt and fair" post-removal review in court, *Berman*, 291 F.3d at 985 (decided in 2002). According to the complaint, defendants never provided that review. Thus, defendants are not entitled to qualified immunity on plaintiffs' post-removal claim, and their motion to dismiss that claim is accordingly denied.

### D.    Bridgett's Individual Procedural Due Process Claim (Count IV)

In addition to the procedural due-process claim Bridgett brings jointly with L.W., Bridgett also brings a separate procedural claim based on DFCS's decision to "indicate" her for child neglect under Allegation 60. *See* [1] ¶¶ 108, 110. Bridgett brings this claim against DCFS investigator Simpson, her supervisors, DCFS administrator Maria Miller, and the director of DCFS.[7] *See id.* ¶ 107. The director is sued in an official capacity, while the other defendants are sued individually. *See id.*

#### 1.    *Simpson, Pierre-Louis, and Carriere*

Bridgett alleges that Simpson violated her right to procedural due process rights by recommending that Bridgett be "indicated" for child neglect without first considering all exculpatory evidence. *See id.* ¶¶ 68, 108. Bridgett also accuses Simpson's supervisors of the same violation. *See id.* To proceed with her claim

---

[7] The complaint names Denise Gonzales, then-acting director of DCFS, as defendant. *See, e.g.*, [1] ¶ 16. As Gonzales was sued in her official capacity, *see id.*, and as the position of DCFS director has changed hands several times throughout this litigation, *see* [20] at 1 n. 1; [27] at 13 n. 2, I refer to this defendant by title rather than by name. *Cf.* Fed. R. Civ. P. 25(d) ("[W]hen a public officer who is a party in an official capacity . . . resigns, or otherwise ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party.")

against the DCFS investigators, Bridgett must allege sufficient facts to plausibly suggest that, by recommending to indicate her for child neglect, the investigators deprived her of a constitutionally protected interest. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *Mason v. Sybinski*, 280 F.3d 788, 794 (7th Cir. 2002)). Bridgett has overcome this hurdle. Bridgett has a protected liberty interest in being able to pursue her occupation of choice, *see id.* at 617, which for Bridgett includes working with children, *see* [1] ¶ 69. Bridgett sufficiently alleges that the decision to indicate her deprived her of this interest because, while that finding remained in the register, she was forced to take a leave of absence from her job and was unable to secure replacement work. *See* [1] ¶¶ 6, 76. Bridgett has alleged a constitutional deprivation.

The next question is whether, in effecting this deprivation, defendants provided Bridgett with constitutionally adequate means to challenge it. Accepting Bridgett's allegations as true, I find that defendants did not do so. Before a DCFS employee may rightfully indicate someone in the central register, or recommend that they be so indicated, due process compels that employee to consider *all* available evidence on the issue, including exculpatory evidence. *See Humphries v. Milwaukee County*, 702 F.3d 1003, 1008 (7th Cir. 2012) (citing *Dupuy v. Samuels*, 397 F.3d 493, 506–07 (7th Cir. 2005)); *see also Dupuy*, 397 F.3d at 506 ("[T]he investigator [must] take into account all of the available evidence that tends to show that abuse or neglect did *or* did not occur.") (first emphasis omitted). Bridgett

alleges here that Simpson, Pierre-Louis, and Carriere each failed to consider all available exculpatory evidence when considering whether to indicate her for child neglect. *See* [1] ¶¶ 79, 108.[8] Taking this statement as true, I find that Bridgett has alleged that Simpson and her supervisors deprived Bridgett of a constitutional interest without first providing due process of law.

Moreover, at the time when DCFS investigators were considering Bridgett's case, they were certainly on notice of what due process required. *See Dupuy*, 397 F.3d at 506 (decided in 2005). Thus, again assuming Bridgett's allegations are correct, qualified immunity is unavailable to Simpson and her supervisors on this claim. *See Abbott*, 705 F.3d at 713 (a plaintiff may overcome an assertion of qualified immunity by showing that the defendant violated a "clearly established" constitutional right).[9]

---

[8] Bridgett does not state explicitly what she believes this exculpatory evidence might be, but I may reasonably infer from the allegations in the complaint that at least the following, according to Bridgett, would tend to show that she did not neglect L.W.: (1) that Bridgett had never been diagnosed with schizophrenia; (2) that multiple hospitals refused to admit her for psychiatric treatment; and (3) that L.W. showed no physical signs of neglect. *See* [1] ¶¶ 41–42, 75; *see also id.* ¶ 106 (incorporating into Count IV the allegations in paragraphs 1–105).

[9] Bridgett also asserts that Simpson, Pierre-Louis, and Carriere violated Bridgett's procedural due-process rights because their recommendation to indicate her was based specifically on Allegation 60, a particular allegation of child abuse or neglect that the Illinois courts had already declared void *ab initio*. *See* [1] ¶ 108; *see also id.* ¶ 36. Defendants argue that it is an open question whether Allegation 60 was truly void when defendants used it to indicate Bridgett. *See* [22] at 12. I need not resolve this disagreement, however, because whether Allegation 60 could properly be used under Illinois law is irrelevant to whether, in using this particular Allegation against Bridgett, defendants followed the procedures required by *federal* law. *See Waubanascum v. Shawano County*, 416 F.3d 658, 666 (7th Cir. 2005) ("State law does not create duties under the federal constitution, and violations of state law are by themselves insufficient to impose liability under § 1983.") (citation omitted); *see also Komyatti v. Bayh*, 96 F.3d 955, 959 (7th Cir. 1996) ("It is well established that the Eleventh Amendment prohibits a federal court from

## 2. *Maria Miller*

Bridgett also asserts Count IV against Maria Miller, the DCFS administrator who presided over the teleconference following Simpson's recommendation to indicate Bridgett—a recommendation with which Miller ultimately agreed. *See* [1] ¶¶ 70–74, 107. Bridgett contends that Miller, too, failed to consider all exculpatory evidence when assessing Bridgett's case. *See id.* ¶¶ 107–08. Defendants argue that, regardless, Miller is entitled to absolute immunity on this claim. *See* [22] at 13–14. I agree.

There are some public officials "whose special functions require a full exemption from liability" for constitutional violations. *Butz v. Economomou*, 438 U.S. 478, 508 (1978) (citations omitted). Judges enjoy such immunity, for example, and so do those whose roles are functionally equivalent to that of a judge. *See id.* at 511–14 (concluding that "quasi-judicial" immunity extends to hearing examiners presiding over administrative adjudications). To determine whether a particular defendant is entitled to absolute immunity, I must look to the nature of the function she has performed. *See Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011) (quoting *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443 (7th Cir. 1996)). The following characteristics should be considered:

> (1) the need to assure that the individual can perform [her] functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for damages actions as a means for controlling unconstitutional conduct; (3) the insulation from political influence;

---

ordering state officials to conform their conduct to state law." (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984))). That defendants' use of Allegation 60 cannot by itself carry Bridgett's due-process claim is ultimately immaterial, though, since the other allegations underlying Count IV are enough to move it forward.

(4) the importance of precedent; (5) [an] adversarial . . . process; and (6) the [ability to correct] error on appeal.

*Id.* (citing *Butz*, 438 U.S. at 512). In light of these considerations, the Seventh Circuit in *Heyde v. Pittenger* concluded that a county-based board of review was entitled to absolute quasi-judicial immunity. *See id.* at 516–19. I find that Maria Miller's role as DCFS administrator is analogous to that of the review board in *Heyde*, and that Miller, too, is therefore entitled to absolutely immunity.

*Heyde* addressed a board of review that acted as fact-finder and decision-maker for disputed property assessments performed initially by the "township assessor." *Id.* at 514, 518. The board had the authority to affirm or revise the initial assessment, but did not take part in the investigation leading to that assessment. *See id.* at 518. Before the board could increase an initial assessment, it had to provide notice and a hearing to the property-owner, where the owner could present evidence in his favor. *See id.* at 518–19. If the owner was dissatisfied with the board's decision, he could appeal that decision to a higher board. *See id.* at 519.

Like the board members in *Heyde*, Miller acted as decision-maker concerning an initial assessment—here, the assessment by DCFS investigators that Bridgett should be "indicated" for child neglect. Miller, too, abstained from participating in the investigation leading to that initial assessment. *See Dupuy*, 397 F.3d at 508 ("[T]he decision-maker at the Administrator's conference is a person who has had no part in the investigative process."). As the accused perpetrator, Bridgett received notice of the administrator's teleconference—which, like the board hearing in *Heyde*, provided the accused with an opportunity to tell her own side of the story

and present evidence on her own behalf. *See* 89 Ill. Admin. Code § 300.160(c); *see also* [1] ¶¶ 32, 65. Finally, as in *Heyde*, Bridgett could appeal Miller's decision to another administrative body (here, an administrative law judge). *See* 325 ILCS 5/7.16; [1] ¶ 34.[10]

Moreover, the assessments at issue, both here and in *Heyde*, are "inherently controversial and likely to result in disappointed parties." 633 F.3d at 519. As demonstrated by the current suit, decisions concerning parental rights or the rights of individuals who would like to continue working with children are not taken lightly by those affected. An administrator's decision to formally "indicate" someone for child abuse or neglect—and, accordingly, to record that decision in a public register—is therefore likely to result in "a multitude of lawsuits" if left unprotected, *id.* For this reason and those explained above, Miller is entitled to absolute immunity on Count IV of Bridgett's complaint.

---

[10] While there are a few differences between the board of review in *Heyde* and Miller's role as administrator, I find these differences to be minimal and thus insignificant. One difference, for example, is that *Heyde* involved a more formal hearing in which witnesses could be called by the board and examined. *See* 633 F.3d at 518–19. The administrator's teleconference, by contrast, is not technically a hearing. *See* 89 Ill. Admin. Code § 300.160(c)(3)(E). Importantly, however, and as discussed above, the accused perpetrator may still present "documentary evidence or other information that supports . . . her position," *id.* § 300.160(c)(1)(A), and the administrator's decision is still subject to appeal, *see* 325 ILCS 5/7.16. These procedures provide the requisite indicia of a hearing that makes the presiding official quasi-judicial.

### 3. *The DCFS Director*

Bridgett also asserts Count IV of her complaint against the director of DCFS, sued in an official capacity. *See* [1] ¶ 107.[11] Defendants argue that the Eleventh Amendment prohibits Bridgett from bringing this claim against the director. I agree.

Because the director is sued in an official capacity, Bridgett's claim against that official operates as a claim against Illinois. *Hafer v. Melo*, 502 U.S. 21, 24 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State." (citing *Graham*, 473 U.S. at 166)). With limited exceptions, the Eleventh Amendment immunizes states and their agencies against suits brought in federal court. *See Council 31 of the Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012). DCFS is a state agency that generally enjoys such protections. *See Woods v. Ill. Dep't of Children and Family Servs.*, 710 F.3d 762, 764–65 (7th Cir. 2013). Consequently, Bridgett may proceed with her claim against the DCFS director only if an exception to state sovereign immunity applies. There are three such exceptions: (1) Congress has abrogated the state's immunity by acting under the legislature's "constitutional authority conveyed by amendments passed after the Eleventh Amendment"; (2) Illinois itself has consented to suit; or (3) the action is permissible under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). *Council 31*, 680 F.3d at 882 (citation omitted). Bridgett does not allege that Illinois has consented to suit, so her

---

[11] Bridgett seeks against the director only declaratory—not monetary—relief under this count. *See id.* ¶ 111.

right to sue the DCFS director must be supported either by congressional abrogation or by *Ex parte Young*. Bridgett's claim fails on both fronts.

First, Bridgett argues that her official-capacity suit against the director is permitted because state agencies may be sued as long as the agency's "policy or custom . . . played a part in the violation of federal law." [27] at 13 (quoting *Hafer*, 502 U.S. at 25). In other words, Bridgett argues that Congress has abrogated immunity from suit under Section 1983 to the extent that the department's "policy or custom" was behind the purported constitutional deprivation. Not so. *See Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719, 721 (7th Cir. 2009) ("[S]tates are not 'persons' within the meaning of section 1983 and so cannot be sued under that section." (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–66 (1989))). Accordingly, Bridgett's right to bring an official-capacity claim against DCFS, if any, must stand on the doctrine of *Ex parte Young*.

The doctrine of *Ex parte Young* permits individual plaintiffs to bring official-capacity suits against state officials only where the complaint alleges "an ongoing violation of federal law and seeks relief properly characterized as prospective." *Council 31*, 680 F.3d at 882 (citation omitted). The specific violation of law allegedly committed by DCFS here was a violation of state, not federal, law. Moreover, Bridgett has not alleged an *ongoing* violation. She alleges only that defendants' decision to "indicate" her under Allegation 60 resulted in a temporary deprivation of her protected liberty interest, as the finding was reversed and expunged six months later. *See* [1] ¶¶ 73, 76–78. Indeed, Bridgett admits in her complaint that she

"successfully sought employment as a substitute teacher" after the indicated finding was reversed. Thus, Bridgett's official-capacity claim against the DCFS director is not permitted under *Ex parte Young*.[12]

Defendants' motion to dismiss Count IV of the complaint is therefore granted in part and denied in part. The motion is granted as it pertains to the individual-capacity claim against Maria Miller, who is entitled to absolute immunity, and as it pertains to the official-capacity claim against the DCFS director, who is protected by sovereign immunity. The motion is denied insofar as it is asserted against Simpson, Pierre-Louis, and Carriere.

### E.    Bridgett's ADA and Rehabilitation Act Claims (Counts V–VI)

Bridgett also brings claims against DCFS, its director, and Simpson, Pierre-Louis, Carriere, and Miller—each in their official capacity—for violations of Title II of the Americans with Disabilities Act (Count V) and Section 504 of the Rehabilitation Act (Count VI). *See* [1] ¶¶ 113–30.

#### 1.    The ADA Claim (Count V)

As Bridgett sues each of the six named defendants in an official capacity, Bridgett's ADA claim is in effect a claim against the state. *Hafer*, 502 U.S. at 24.[13] A threshold issue, then, is whether sovereign immunity bars this claim. Congress has abrogated the states' immunity from suit under Title II of the ADA only to the

---

[12] I therefore do not determine whether the declaratory relief Bridgett seeks in Count IV may be properly characterized as "prospective," *Council 31*, 680 F.3d at 882.

[13] Bridgett need not have sued six separate defendants in their official capacities, as the claims are duplicative. But defendants do not complain of the redundancy, so I do not address it further.

extent that the plaintiff seeks relief "for conduct that actually violates the Fourteenth Amendment" of the United States Constitution. *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis omitted). Thus, the question here is whether the same conduct that Bridgett alleges to have violated the ADA also controverted her Fourteenth Amendment due-process rights.

Bridgett first contends that DCFS violated the ADA by "maintaining and implementing a void allegation" (*i.e.*, Allegation 60). [1] ¶ 119. According to Bridgett, defendants' use of Allegation 60 was unlawful under the Act because this allegation "authorizes discrimination against persons with any mental health condition." *Id.* Defendants' use of Allegation 60 cannot properly support Bridgett's ADA claim because, as explained above at footnote 9, the use of that Allegation is not a ground on which Bridgett's procedural-due process claim (Count IV) may properly rest.[14] If defendants' use of Allegation 60 did not also violate the Fourteenth Amendment, the state cannot be held accountable for that conduct under Title II of the ADA. *See Georgia*, 546 U.S. at 159.[15]

My inquiry does not end here, however, as Bridgett also alleges that DCFS discriminated against her within the meaning of the ADA because they knew that she had in the past suffered from depression, and believed that she may also be afflicted with paranoid schizophrenia, and on that basis decided to interfere with

---

[14] Count IV is the only count of the complaint in which Bridgett alleges that defendants' use of Allegation 60 violated her constitutional rights.

[15] Nor is *Ex parte Young* a viable alternative—even for non-monetary relief—since, here again, Bridgett does not allege an *ongoing* violation of federal law. *See Council 31*, 680 F.3d at 882. Defendants purportedly used Allegation 60 against Bridgett only in 2012, and she suffered only a temporary injury as a result. *See* [1] ¶¶ 65, 73–79.

her protected rights. *See* [1] ¶ 118. I need not determine whether sovereign immunity also bars Bridgett from relying on these allegations, because they fail to state a viable claim for another reason.

To state a proper claim for intentional discrimination under Section 202 of the ADA, Bridgett must allege that defendants acted adversely toward her "by reason of" her (perceived) disability. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014) (quoting 42 U.S.C. § 12132). To meet this requirement, Bridgett must allege not simply that her disability was *a* basis for defendants' actions, but *the* basis. *See, e.g, id.* (explaining that Section 202 of the ADA and Section 504 of the Rehabilitation Act are coextensive, and that the latter explicitly requires a plaintiff to prove discrimination "*solely* by reason of her . . . disability" (quoting 29 U.S.C. § 794)) (emphasis added). On this front, her complaint falls short. Bridgett alleges in Count V that defendants decided to interfere with her protected interests (parental and career-based) because of the perception that she suffered from a mental illness. *See* [1] ¶ 118. Earlier in her complaint, however—in allegations she incorporates by reference into her ADA claim, *see id.* ¶ 114— Bridgett in effect admits that defendants' conduct was not based *solely* on the fact that she suffered from a (perceived) disability. Defendants considered other factors, too, including comments by Bridgett's family that she had been behaving "bizarrely," *see id.* ¶ 48, and a report that her mental health "posed a threat to L.W.'s safety," *id.* ¶ 75. The complaint, in short, does not plausibly suggest that Bridgett's (perceived) mental illness was the only influence on defendants' decision-

making. It instead suggests that defendants also took into account the possible impact of this (perceived) illness on L.W.'s wellbeing.[16]

Defendants' motion to dismiss Bridgett's ADA claim (Count V) is therefore granted.

### 2. The Rehabilitation Act Claim (Count VI)

Bridgett also brings a Rehabilitation Act claim against the same six defendants, again sued in their official capacities. *See* [1] ¶ 124. As in her ADA claim, and as just discussed, Bridgett alleges that defendants discriminated against her within the meaning of the Rehabilitation Act by deciding to interfere with her protected interests solely because she suffered, or was perceived to suffer, from a mental illness. *See id.* ¶ 127. The relief available under Section 504 of the Rehabilitation Act is coextensive with the relief available under Section 202 of the ADA, and, with minor differences,[17] the analysis governing both provisions is the same. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012); *see also CTL,*

---

[16] Plaintiffs argue that defendants have failed to explain how acting on a report of "bizarre" behavior is in any way "different or separate from" acting on the belief that someone is suffering from schizophrenia—and that, consequently, defendants have failed to show (based on the allegations in the complaint) that they actually took into account factors other than Bridgett's supposed disability. *See* [27] at 11. This argument misses the point. Defendants need not explain how believing that someone has been acting "bizarrely" may be different from believing that that person suffers from schizophrenia, as the difference is self-evident. Individuals who do not suffer from schizophrenia may behave quite strangely—and put their children at risk as a result—just as those who have been diagnosed with this illness may behave as though they do not suffer from it at all. That defendants considered how Bridgett was actually behaving suggests that they looked beyond the mere fact of her disability before interfering with any of her protected rights.

[17] Unlike the ADA, the Rehabilitation Act also requires that the defendant accused of discrimination have received federal funding. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). Bridgett has satisfied this requirement by alleging that DCFS receives financial assistance from the federal government. *See* [1] ¶ 127.

743 F.3d at 528. Thus, for the same reasons that the above allegations fail to state a proper claim under the ADA, the analogous portion of Bridgett's Rehabilitation Act claim also falls short.

There is a second part to Bridgett's Rehabilitation Act claim, however, and that part once again relies on defendants' use of the "void" Allegation 60. *See* [1] ¶ 128. Bridgett contends that defendants' decision to "indicate" her under Allegation 60 violated the Rehabilitation Act because that Allegation permitted DCFS to declare persons with disabilities "neglectful *per se*." *Id.* Unlike her ADA claim, Bridgett's Section 504 claim may in theory stand on defendants' use of Allegation 60 since, to proceed under the Rehabilitation Act, Bridgett need not prove that this conduct also violated the Fourteenth Amendment. *See Jaros*, 684 F.3d at 672 n. 5 (explaining that in exchange for federal funds, Illinois has waived its immunity from suit under the Rehabilitation Act).

Bridgett asserts that Allegation 60 permitted DCFS to declare those with disabilities as inherently neglectful, *see* [1] ¶ 128, but she has not alleged any facts that actually support this contention. Moreover, even if it is the case that Allegation 60 somehow authorized DCFS to automatically declare anyone with a disability a perpetrator of child neglect, Bridgett has not successfully alleged that that is what defendants did here. As discussed above, Bridgett states elsewhere in her complaint—in allegations that are also incorporated by reference in Count VI, *see id.* ¶ 123—that defendants based their decision to "indicate" her on the assertion that Bridgett's mental health "posed a threat to L.W.'s safety," *id.* ¶¶ 6, 75. Thus,

here again, the complaint plausibly suggests only that Bridgett's (perceived) mental illness was one of multiple factors in defendants' decision-making, not the sole factor necessary to state a claim for relief under Section 504, *see CTL*, 743 F.3d at 528.

Defendants' motion to dismiss Bridgett's claim under Section 504 of the Rehabilitation Act (Count VI) is therefore granted.

## IV.  Conclusion

For the reasons discussed above, defendants' motion to dismiss, [20], is granted in part and denied in part. The motion is granted as it pertains to: (1) L.W.'s substantive due-process claim (Count II), insofar as that claim concerns her initial removal and continued withholding (*i.e.*, from July 31 to August 14, 2012); (2) Bridgett's procedural due-process claim (Count IV), insofar as that claim is asserted against Maria Miller (who is entitled to absolute immunity) and the DCFS director (who is protected by sovereign immunity); (3) Bridgett's ADA claim (Count V); and (4) Bridgett's Rehabilitation Act claim (Count VI). The motion is denied with respect to the remaining claims. Defendants DCFS, Miller and the DCFS director are terminated as parties to this case.

ENTER:

Manish S. Shah
United States District Judge

Date:  11/10/14